CEDAR–RIVERSIDE ASSOCIATES, INC., a Minnesota Corporation, Cedar-Riverside Properties, a Minnesota Limited Partnership, Cedar-Riverside Land Corporation, a Minnesota Corporation, Cedar-Riverside Land Co., a Minnesota Partnership, Stage I Land Co., a Minnesota Limited Partnership, Stage II Land Co., a Minnesota Limited Partnership, Stage III Land Co., a Minnesota Limited Partnership, F Building Land Co., a Minnesota Partnership, Keith Heller, Mary Doe and John Roe, Plaintiffs,

v.

The UNITED STATES of America, Patricia R. Harris, Secretary of the Department of Housing and Urban Development, William J. White, General Manager of the New Community Development Corporation, United States Department of Housing and Urban Development, New Community Development Corporation, New Communities Administration, Federal Housing Administration (herein collectively referred to as the Federal Defendants), First Trust Company of St. Paul, Inc., a Minnesota Corporation, the City of Minneapolis, and the Minneapolis Housing and Redevelopment Authority, Defendants.

No. 4–77 Civ. 428.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 18, 1978.

James P. Larkin, Peter K. Beck, James E. Strother, Larkin, Hoffman, Daly & Lindgren, Ltd., and James D. Lano, Oppenheimer, Wolff, Foster, Shepard & Donnelly, Minneapolis, Minn., for plaintiffs.

Andrew W. Danielson, U. S. Atty. by Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., for Federal defendants.

Ronald A. Zamansky, and Stephen T. Refsell, Doherty, Rumble & Butler, Minneapolis, Minn., for defendant First Trust Co. of St. Paul, Inc.

Walter J. Duffy, Jr., City Atty. by Jerome F. Fitzgerald, Asst. City Atty., Minneapolis, Minn., for defendant the City of Minneapolis.

John M. LeFevre, Jr., and John M. Utley, Holmes, Kircher & Graven, Minneapolis, Minn., for defendant Minneapolis Housing and Redevelopment Authority.

## MEMORANDUM ORDER

ALSOP, District Judge.

This matter comes before the court upon the motions of the defendants, the City of Minneapolis and the Minneapolis Housing and Redevelopment Authority, to dismiss the complaint herein pursuant to Rule 12 of the Federal Rules of Civil Procedure. Both of these defendants seek to dismiss the complaint, as against them, for lack of subject matter jurisdiction (Rule 12(b)(1)) and for failure to state a claim upon which relief can be granted (Rule 12(b)(6)). Memoranda have been submitted by these two defendants and by the plaintiffs, and oral argument was heard on April 14, 1978 and on July 14, 1978.

## FACTUAL BACKGROUND

The facts surrounding this action are complicated and lengthy. The underlying dispute between the parties arose in connection with the "Cedar-Riverside New Town in Town" housing project in Minneapolis. In 1968, the Cedar-Riverside Urban Renewal Plan was approved by the Minneapolis City Council and by the Minneapolis Housing and Redevelopment Authority (MHRA). In 1970, the plaintiff Cedar-Riverside Associates, Inc., was selected by the MHRA as the private developer for 100 acres of land within the Urban Renewal Area. At that time, the Development Plan contemplated a ten-stage residential and commercial development between 1972 and 1991 which would provide approximately 12,500 dwelling units. In 1971, the United States Department of Housing and Urban Development (HUD) guaranteed $24 million of the developer's obligations pursuant to Title VII of the Housing and Urban Development Act of 1970, 42 U.S.C.A. § 4501 et seq.

The New Community Development Corporation within HUD adopted a resolution on December 10, 1976 concerning the acquisition and disposition of the Cedar-Riverside New Town in Town. The resolution proposed a continuation of the development with the construction of a minimum of 5,000 new units. The resolution directed HUD to determine whether this alternative was acceptable to the local parties and the City of Minneapolis.

On February 16, 1977, a unanimous resolution of the Minneapolis City Council was approved by the Mayor of Minneapolis establishing the Cedar-Riverside Task Force.

The Task Force was responsible for developing and recommending a plan for the redevelopment and rehabilitation of the Cedar-Riverside area. After studying the area, the Task Force proposed a residential development in Cedar-Riverside of 1,900 new apartment units and 450 rehabilitated apartment units. Certain design and site changes were recommended by the Task Force, particularly with respect to Stage II. In addition, the Task Force recommended that the Cedar-Riverside area not be developed as a regional retail commercial center serving a wide geographic area.

The Task Force proposal is a substantial departure from the Cedar-Riverside New Town contemplated in the 1968 Urban Renewal Plan. If the Task Force report is implemented, the projected densities in the Cedar-Riverside area at project maturity will be reduced from 12,500 dwelling units, the number permitted under the 1968 Urban Renewal Plan, to 1,900 new dwelling units, 450 rehabilitated units, and 2,113 existing units. With respect to Stage II, the densities will be reduced from 1,800 units to 706 units. In addition, the Task Force proposes substantial changes in building design, building location and commercial development.

On May 19, 1977, the MHRA unanimously adopted the land use recommendations contained in the Task Force report. At the Minneapolis City Council meeting on May 27, 1977, the council formally adopted the Task Force report by a vote of eight to five. However, neither the MHRA nor the Minneapolis City Council has taken any formal action which would alter the maximum residential densities permitted by the Cedar-Riverside Urban Renewal Plan or which would amend the Minneapolis Zoning Ordinance.

## PROCEDURAL HISTORY

In the twelfth and thirteenth causes of action in the original complaint, plaintiffs seek relief from the MHRA and the City of Minneapolis for intentional interference with an existing contractual relationship between the plaintiffs and the federal defendants.

In the fifteenth and sixteenth causes of action in the amended complaint, plaintiffs claim that the MHRA and the City of Minneapolis breached their statutory obligation to comply with the National Housing policy established by Congress in the National Housing Act of 1949, 42 U.S.C. § 1441 et seq.

The seventeenth and eighteenth causes of action in the amended complaint contain plaintiffs' claims of relief from the City of Minneapolis and the MHRA for their actions in adopting the Task Force report, which reduces the permitted densities in the Cedar-Riverside area. Plaintiff developers claim these actions deprived them of their property without due process of law in violation of the Fourteenth Amendment of the United States Constitution.

Finally, in the nineteenth cause of action in the amended complaint, plaintiffs allege that the MHRA and the City of Minneapolis conspired between themselves and with other groups to restrain competition in violation of the Sherman Antitrust Act.

## NATIONAL HOUSING ACT CLAIM

The plaintiffs' fifteenth and sixteenth causes of action in their amended complaint allege that the MHRA and the City of Minneapolis violated the National Housing Act of 1949, 42 U.S.C. § 1441 et seq. (Housing Act), by diverting federal funds earmarked for the Cedar-Riverside Urban Renewal Area to other projects and by failing to effectively utilize federal funds provided for the administration of all MHRA projects, including the Cedar-Riverside Urban Renewal Area. The plaintiffs also assert that the adoption of the Task Force report by the MHRA and the City of Minneapolis violated the Housing Act. Plaintiffs' final claim is a right to damages as a third-party beneficiary of the contract between the MHRA, the City of Minneapolis and the federal defendants.

The first question presented is whether the MHRA and the City of Minneapolis are bound by the provisions of the Housing Act. Since the Housing Act is a federal law which purports to apply only to

a federal administrative body, the obligations of the Housing Act can be asserted against the MHRA and the City of Minneapolis only on the basis that these two defendants voluntarily assumed the obligations of the Housing Act by exercising their power to act as agents of the federal government. *See Minn. Stat.* § 462.445, subd. 4(2) (1976). In their amended complaint, plaintiffs allege that these two defendants were acting as agents of the federal government in exercising powers granted by the Housing Act. For the purposes of a motion to dismiss for failure to state a claim, well pleaded material allegations of the complaint are taken as admitted. *See* 3B *Moore's Federal Practice*, § 12.08. Therefore, the plaintiffs' allegations that these defendants acted as agents for the federal government in implementing the Housing Act must be taken as admitted.

■■ Nevertheless, the plaintiffs' claims must be dismissed since the National Housing Act does not create a private cause of action. Under *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), four factors must be considered when determining whether a private cause of action has been created by federal statute:

1) Is the plaintiff one of the class for whose especial benefit the statute was enacted? 2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? 3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? 4) Is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law?

In a case similar to the present case, *M. B. Guran Co., Inc. v. City of Akron,* 546 F.2d 201 (6th Cir. 1976), the Sixth Circuit Court of Appeals examined the four factors established by *Cort v. Ash, supra,* and held that the National Housing Act did not create an expressed nor an implied private cause of action. The plaintiff in *Guran* brought suit to enjoin the defendant from awarding a contract to anyone other than

itself. The basis for the plaintiff's claim was that it was the lowest bidder on a contract in an urban renewal project, and that the HUD Urban Renewal Handbook, issued pursuant to the National Housing Act of 1949, required the award of contracts to the lowest bidder.

In dismissing the plaintiff's claim, the court in *Guran* applied the factors contained in *Cort v. Ash, supra,* and stated that:

[T]he class for whose especial benefit the Housing Act was enacted must be the persons who inhabit inadequate housing. Second, there is no indication of legislative intent to create the remedy sought by plaintiff . . . Third, insofar as the existence of a private cause of action would lead to numerous suits against the local authority, the construction of urban projects would be delayed and the underlying purposes of the legislative scheme would be thwarted. . . . Finally, we see this case as one which is traditionally relegated to state law.

This court adopts the test established by *Cort v. Ash, supra,* and the reasoning used by the Sixth Circuit in *Guran* in applying these factors to an action involving the National Housing Act. Accordingly, plaintiffs' fifteenth and sixteenth causes of action, insofar as they are based on a claim arising out of an alleged violation of the Housing Act, must be dismissed since the National Housing Act does not create a private cause of action.

■ As a result, the only claim of the plaintiffs remaining under the fifteenth and sixteenth causes of action is their assertion of a right to damages as a third-party beneficiary of a contract between the MHRA, the City of Minneapolis and the federal defendants. In the opinion of the court, this claim is really based on a statutory duty imposed upon the defendants by the Housing Act and is not based on contract theory. Therefore, this part of the fifteenth and sixteenth causes of action must be dismissed also since this court holds that violations of the Housing Act do not give rise to a private cause of action. Even

if this part of the fifteenth and sixteenth causes of action does arise out of contract theory, it should still be dismissed since any contract executed by the MHRA, the City of Minneapolis and the federal defendants would not create third-party beneficiary rights in favor of the plaintiffs. *Commonwealth of Pennsylvania v. National Association of Flood Insurers,* 378 F.Supp. 1339 (M.D.Penn.1974), *aff'd in part, rev'd in part on other grounds,* 520 F.2d 11 (3d Cir. 1975); and *McCullough v. Redevelopment Authority of the City of Wilkes-Barre,* 522 F.2d 858 (3d Cir. 1975).

Finally, even if a private right of action was created by the Housing Act, the plaintiffs still could not maintain their fifteenth and sixteenth causes of action against the City of Minneapolis and the MHRA because they lack the requisite Article III standing and are not the appropriate parties to bring such an action. The plaintiffs have never been the direct beneficiaries of the distribution of funds by the MHRA and the City of Minneapolis in the Cedar-Riverside area. It is purely speculative whether any expenditure of funds by the MHRA and the City of Minneapolis in any manner other than that which actually occurred would have harmed or benefited the plaintiffs. As a result, the plaintiffs cannot establish an injury in fact as a matter of law. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

In *Gardner v. Nashville Housing Authority,* 468 F.2d 480 (6th Cir. 1972), and *McCullough v. Redevelopment Authority of Wilkes-Barre,* 522 F.2d 858 (3d Cir. 1965), the respective courts implied that a private cause of action may be allowed in certain circumstances under certain parts of the Housing Act. However, in *Gardner* the plaintiffs were private citizens who owned property within the Urban Renewal area and in *McCullough* the plaintiffs were private citizens who owned flood-damaged houses. Neither court indicated that it would allow a private cause of action in favor of a plaintiff-developer. Also, the claims in these two cases involved different parts of the Housing Act than are involved in the present case.

## FOURTEENTH AMENDMENT CLAIM

The seventeenth and eighteenth causes of action in the plaintiffs' amended complaint allege that defendants City of Minneapolis and MHRA, by adopting the Task Force report reducing permitted densities in the Cedar-Riverside area, deprived plaintiff developers of their property without due process of law in violation of the Fourteenth Amendment of the United States Constitution.

 The first issue presented is whether 28 U.S.C. § 1331 provides a basis for subject matter jurisdiction over the plaintiffs' seventeenth and eighteenth causes of action in their amended complaint. An action arises under the Constitution within the meaning of 28 U.S.C. § 1331(a) when the right of the plaintiffs to recover under their complaint will be sustained if the Constitution and laws of the United States are given one constructio. and will be defeated if they are given another. *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Because plaintiffs here allege a violation of their federal constitutional rights and damages in excess of $10,000, federal subject-matter jurisdiction exists over their constitutional claim against the MHRA and the City of Minneapolis.

The more critical issue is whether a federal cause of action exists against a municipality for money damages based on alleged deprivations of Fourteenth Amendment rights. In *Livingood v. Townsend,* 422 F.Supp. 24 (D.Minn.1976), this court held that no cause of action implied from the Fourteenth Amendment exists for suits against municipalities premised upon alleged deprivations of constitutional rights. This implied cause of action is the theory of plaintiffs' claims against the MHRA and the City of Minneapolis in the Seventeenth and Eighteenth causes of action contained in the amended complaint.

The plaintiffs in *Livingood* attempted to extend the doctrine of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1970), which recognized an implied cause of action under the

Fourth Amendment of the United States Constitution for damages against federal agents for violation of the Fourth Amendment's prohibition of unreasonable searches and seizures, to suits against municipalities. This court held that to permit a damage action against a municipality under the Fourth and Fourteenth Amendments would be to circumvent the direct prohibition of such actions under 42 U.S.C. § 1983, and refused to extend the *Bivens* doctrine to actions against municipalities. Plaintiffs in this case are likewise asking this court to extend *Bivens* to suits against municipalities.

*Bivens* did not create a new remedy for unconstitutional activity for state or local officers because redress was already available under § 1983. Rather, *Bivens* merely filled an incomplete statutory framework by providing otherwise unprotected victims of unconstitutional federal action the same remedy that § 1983 provides victims of similar conduct by state and local officials. *Livingood v. Townsend, supra.*

Since *Livingood,* the U. S. Supreme Court, in *Monell v. Department of Social Services of the City of New York,* 436, U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), held that municipalities and other local government units are "persons" that can be sued directly under 42 U.S.C. § 1983 for monetary, declaratory, or other injunctive relief where the alleged unconstitutional action executes governmental policy or custom, but such governmental entities cannot be held liable on respondeat superior theory. Although *Monell* appears to undermine part of the basis for this court's holding in *Livingood,* the rationale and holding in *Livingood* are still very much applicable to our present case.

Although municipalities may now be sued in certain circumstances under § 1983 according to the *Monell* rule, to allow an implied cause of action against municipalities under the *Bivens* doctrine would in effect circumvent any qualified immunity that still exists for municipalities under § 1983 after *Monell.* This court is unwilling to participate in such a result.

Also, *Bivens* was designed to provide plaintiffs with relief for actions of federal officials which were not covered by § 1983. However, here there is no gap in § 1983 coverage for actions against municipalities since *Monell* provides that municipalities may now be sued under § 1983. Therefore, in contrast with the plaintiff in *Bivens,* there is no need for federal courts to create a cause of action for these plaintiffs, since they should have adequate relief under a § 1983 action.

To the extent the Supreme Court created a new constitutional tort in *Bivens,* this court will continue to limit its application to violations of the Fourth Amendment by federal officials.

In *Owen v. City of Independence, Mo.,* 560 F.2d 925 (8th Cir. 1977), the Court of Appeals for the Eighth Circuit held that a city official, whose employment was terminated without a hearing, could maintain an equitable action for backpay founded on alleged procedural due process violations against the city as well as the individuals who actually ordered the termination. Jurisdiction was based on 28 U.S.C. § 1331 and the cause of action existed by implication from the Fourteenth Amendment.

*Owen* can be distinguished from the present case in several ways. First, *Owen* attempted to fill the gap in § 1983 by allowing an implied cause of action against the city under the Fourteenth Amendment. However, *Monell* now allows municipalities to be sued under § 1983, so there is no longer any need to create a *Bivens* type remedy for plaintiffs who would otherwise be without relief. Second, the court in *Owen* allowed an implied cause of action for equitable relief only, and was careful to note that their holding did not cover situations in which the plaintiff seeks legal damages. Finally, the plaintiff in *Owen* alleged a violation of his procedural due process rights, whereas the plaintiffs in this case are seeking relief for an alleged violation of their substantive due process rights.

 Therefore, this court holds that no cause of action implied from the Fourteenth Amendment exists for suits against munici-

palities premised upon alleged deprivations of constitutional rights. The seventeenth and eighteenth causes of action in the plaintiffs' amended complaint shall be dismissed for failure to state a claim upon which relief can be granted (F.R.Civ.P. 12(b)(6)).

As a result of this court's holding, it is not necessary to consider the additional allegations of the defendants that the seventeenth and eighteenth causes of action should be dismissed because they are not ripe for judicial review.

## SHERMAN ANTITRUST ACT CLAIM

Plaintiffs, in the nineteenth cause of action in their amended complaint, allege that the City of Minneapolis, the Cedar-Riverside Project Area Committee (PAC) and the MHRA conspired to prevent plaintiffs from effectively participating in the Cedar-Riverside Project in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* It is the position of the MHRA and the City of Minneapolis that they are immune from an antitrust claim pursuant to the standards established by the Supreme Court in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).

In *Parker,* the Supreme Court found that regulation of the California raisin production industry pursuant to a general state law authorizing the control of the market in any agricultural commodity produced in the state was beyond the reach of the Sherman Act. Even though the California program was to be established only upon the petition of ten producers of any agricultural product, it was still found to be immune from the antitrust laws mainly because of the administration of the program by state officials. The court stated that a state program is immune from the antitrust laws whenever it implicates a policy of sufficient weight to overcome the presumption against implied exclusions from the antitrust laws.

In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Supreme Court further clarified the *Parker* test. In *Lafa-*

*yette,* cities which owned and operated electric utility systems brought an action against a competing privately owned electric utility charging a violation of the Sherman Act. The privately owned utility counterclaimed charging the cities with a violation of the antitrust laws. In holding that cities may be held liable for antitrust violations, the court stated that in two instances it has recognized that countervailing policies may be sufficiently weighty to override the presumption against implied exclusions from coverage of the antitrust laws. However, the policies must be very important, since "common to the two implied exclusions was a potential conflict with policies of signal importance in our national traditions and governmental structure of federalism." *City of Lafayette v. Louisiana Power & Light Co., supra.*

For example, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), involved a claim by the plaintiffs that the defendants had violated the antitrust laws by engaging in a concerted effort to influence lawmakers to enact legislation beneficial to themselves. The court stated that the defendant's actions were exempt from the antitrust laws, since to hold otherwise would threaten the constitutionally protected right of petition and would impede the open communication between the polity and its lawmakers which is vital to the functioning of a representative democracy.

In *Parker v. Brown, supra,* the court exempted the California program from the antitrust laws in order to prevent Congress from interfering with the right of a state to control its officers and agents.

In applying this test to the facts in the present case, it appears to the court that the policies of the Minnesota Housing and Urban Development Act, while important, are not of such "signal importance in our national traditions and governmental structure" as to overcome the fundamental policies of the federal antitrust laws. Therefore, the defendants cannot be granted immunity from the antitrust laws on this ground.

In *Lafayette,* the Supreme Court established another test for determining if a state and its subdivisions are exempt from the antitrust laws. In holding that state subdivisions are not automatically exempt from liability under the antitrust laws, the *Lafayette* court concluded that:

> [T]he *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service. . . . This does not mean, however, that a political subdivision necessarily must be able to point to a specific detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit . . . an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." 435 U.S. at 413–15, 98 S.Ct. at 1137–38, 55 L.Ed.2d at 383–84.

The state program involved in the present case is found at *Minn.Stat.* § 462.411 *et seq.* The fundamental purposes for this Act are the promotion of the public health, safety and morals as well as the social benefit to be derived from the redevelopment of blighted areas. The Minnesota Legislature found that the redevelopment of substandard and blighted urban areas cannot be remedied by the ordinary operations of private enterprise or by regulation alone. *Minn.Stat.* § 462.415, subd. 2. Housing and redevelopment authorities were authorized in each municipality within the state, pursuant to *Minn.Stat.* § 462.425, subd. 1, to provide government assistance in this area. Housing and redevelopment authorities were given the power of eminent domain. Competitive bidding, which is mandatory for other types of contracts, is not required when an authority disposes of real property it has acquired. *See Minn. Stat.* §§ 462.445, subd. 1(7), 462.461 and 462.525. Redevelopers within a project area are prohibited from conveying real property purchased from an authority without the authority's consent. *See Minn.Stat.* § 462.525, subd. 5. Housing authorities are given the power to develop, with the approval of the municipality in which they are located, urban redevelopment plans. *See Minn.Stat.* §§ 462.521 and 462.515. Also, control over the construction of the projects is vested within the housing authorities. *See Minn.Stat.* § 462.445, subd. 1(3).

In *Minn.Stat.* § 462.415, the legislature provided that:

> [T]he municipality, to the greatest extent it determines to be feasible in carrying out the provisions of [the Housing Act], shall afford maximum opportunity, consistent with the sound needs of the municipality as a whole, to the rehabilitation or redevelopment of areas by private enterprise.

This section recognizes that the municipalities are the final arbiters in this area, and that they are given a great deal of discretion in deciding whether private enterprise should be used in the redevelopment of given areas.

This statutory scheme as a whole evidences an intent by the legislature to permit the municipalities and the housing authorities to engage in anticompetitive activities in this area. These activities are simply necessary to the promotion of the housing program. Thus, this court concludes that the types of powers which may be exercised by the municipalities and the housing authorities suggest a state policy of displacement of competition with regulation or monopoly public service. Also, the legislature contemplated, in general, that the MHRA and the City of Minneapolis would engage in various actions in connection with the redevelopment of urban areas. As a result, the allegedly anticompetitive acts of the defendants City of Minneapolis and the MHRA qualify under *Lafayette* for the state action immunity since both defendants have been granted a lawful monopoly pursuant to the Minnesota Housing and Redevelopment Act.

The holding of the court in *Lafayette* is not applicable in our case since the munici-

pality in *Lafayette* was engaged in a profit-making activity which was not an activity normally engaged in solely by the state. This situation simply does not exist in the present case. Also, the statutory scheme in *Lafayette* is completely different from the scheme established by the Minnesota Legislature here.

■ The final issue presented is whether the MHRA and the City of Minneapolis may be held liable for exceeding the scope of their lawful monopoly. In *Lafayette* the Supreme Court noted several times that the grant of a lawful monopoly by the state will not immunize the municipalities from unlawful activities outside the scope of that grant. Specifically, the court stated that "even a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." 435 U.S. at 417, 98 S.Ct. at 1139, 55 L.Ed.2d at 385.

In their amended complaint, plaintiffs allege that the MHRA and the City of Minneapolis violated the antitrust laws by adopting the Task Force report and by acting in concert with a private party, known as the Project Area Committee (PAC), in order to restrain competition. The plaintiffs have alleged that these acts of the defendants exceeded the scope of activities contemplated by the Minnesota Legislature in granting the defendants a lawful monopoly. Since the well pleaded material allegations of a complaint are taken as admitted for the purposes of a motion to dismiss for failure to state a claim, the plaintiffs' nineteenth cause of action in their amended complaint cannot be dismissed at this point in the litigation. Therefore, plaintiffs are entitled to submit further evidence to prove these allegations.

Notwithstanding the plaintiffs' right to attempt to establish an evidentiary base for these allegations, it is difficult for the court to imagine the type or character of evidence available to the plaintiffs sufficient to support these claims. In the procedural posture in which this matter is now presented, however, the court is unable to treat the matter as a motion for summary judgment under the provision of Rule 12(b)(6) which permits of such treatment, since there is an absence of materials outside the pleadings. It would appear to the court, however, that this may be an instance where the issue thus remaining could properly be considered under a motion pursuant to Rule 56.

## PENDENT JURISDICTION ISSUE

■ In the twelfth and thirteenth causes of action in the original complaint, plaintiffs seek relief from the MHRA and the City of Minneapolis basically for intentional interference with an existing contractual relationship between the plaintiffs and the federal defendants.

At a hearing on April 14, 1978, this court informed both parties that under *Bor-Son v. Heller*, (D.Minn.1977), *aff'd*, 572 F.2d 174 (8th Cir. 1978), federal subject-matter jurisdiction could not be asserted, under 28 U.S.C. § 1331, over the claims against the MHRA or the City of Minneapolis contained in the twelfth and thirteenth causes of action. In *Bor-Son*, this court held that federal question jurisdiction does not apply to a claim involving interference with contract and that interference with contract is basically a state law claim. Since the twelfth and thirteenth causes of action essentially contain interference with contract claims, there are no independent grounds for federal jurisdiction over these causes of action.

As a result, the twelfth and thirteenth causes of action must be dismissed unless pendent jurisdiction can be used by the plaintiffs in order to obtain federal subject-matter jurisdiction over these claims.

In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court adopted the current rule for determining when a state claim can be subject to the pendent jurisdiction of a federal court. *United Mine Workers of America v. Gibbs, supra*, permits a federal court to hear and determine state law claims against a defendant if: (1) the defendant is before the court as a party to a federal claim over which the court has subject-matter jurisdiction; (2) the state and federal claims derive

from a common nucleus of operative facts; (3) the plaintiff would ordinarily be expected to try both claims in one judicial proceeding; and (4) the federal court chooses to exercise its discretion to hear the state law claim.

In applying this test to the facts in the present case, it is clear that the first requirement is satisfied since the MHRA and the City of Minneapolis are already before the court as defendants to the federal antitrust claim over which the court has subject-matter jurisdiction.

The second requirement is also satisfied since the interference with contract claim and the antitrust claim derive from a common nucleus of operative fact. Both of these claims require a focus on the immediate events surrounding the actions of the MHRA and the City of Minneapolis in adopting the Task Force report. Adoption of the Task Force report is a key element in both claims.

Thirdly, although the plaintiff could probably try both of these claims in separate judicial proceedings, to do so would result in unnecessary duplication of some of the evidence. The plaintiff and the defendants would not be unfairly prejudiced if these two claims were tried in the same judicial proceeding.

Finally, the federal court may exercise its discretion and hear the state law claims when prompted by considerations of economy, convenience and fairness. Trial of these two claims simultaneously will enable this court to achieve the most efficient disposition of the case by avoiding piecemeal litigation. Convenience and fairness to the litigants will result because all claims will be tried in one proceeding, decreasing the chance of inconsistent results as well as making litigation less expensive.

As a result, this court concludes that it has subject-matter jurisdiction over the twelfth and thirteenth causes of action based upon pendent jurisdiction.

Upon the foregoing,

IT IS ORDERED That the motion of the defendants MHRA and the City of Minneapolis to dismiss the fifteenth and sixteenth causes of action in the plaintiffs' amended complaint for failure to state a claim upon which relief can be granted (F.R.Civ.P. 12(b)(6)) be and hereby is granted. The court further finds, pursuant to Rule 54(b) of the F.R.Civ.P., that there is no just reason for delay of entry of judgment. Accordingly, the clerk shall enter judgment dismissing with prejudice the fifteenth and sixteenth causes of action.

IT IS FURTHER ORDERED That the motion of the defendants MHRA and the City of Minneapolis to dismiss the seventeenth and eighteenth causes of action in the plaintiffs' amended complaint for failure to state a claim upon which relief can be granted (F.R.Civ.P. 12(b)(6)) be and hereby is granted. The court further finds pursuant to Rule 54(b) of the F.R.Civ.P. that there is no just reason for delay of entry of judgment. Accordingly, the clerk shall enter judgment dismissing with prejudice the seventeenth and eighteenth causes of action.

IT IS FURTHER ORDERED That the motion of the defendants MHRA and the City of Minneapolis to dismiss the nineteenth cause of action in the plaintiffs' amended complaint for failure to state a claim upon which relief can be granted (F.R.Civ.P. 12(b)(6)) be and hereby is denied.

IT IS FINALLY ORDERED That the motions of the defendants MHRA and the City of Minneapolis to dismiss the twelfth and thirteenth causes of action in the original complaint for lack of subject-matter jurisdiction (F.R.Civ.P. 12(b)(1)) be and hereby are denied, with leave granted to these defendants to renew this motion at a later date if circumstances change.